UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
v.                                  )   Case 5:25-cr-20543
                                    )
Cemhan "Jimmy" Biricik,             )
Dr. Martin Perlin,                  )
                                    )
         Defendants.                )
_____ )

# MOTION FOR MODIFICATION OF POST-INDICTMENT ASSET SEIZURE

Defendant Cemhan Biricik ("Mr. Biricik"), by counsel, respectfully requests this Court modify the post-indictment seizure of assets related to this criminal case. In support of this motion, Defendant states as follows:

1. On July 22, 2025, Mr. Biricik and Codefendant Martin Perlin, M.D. were indicted in the Eastern District of Michigan on one count of Conspiracy to Commit Health Care Fraud under 18 U.S.C. § 1349, and fifty-eight (58) counts of individual acts of health care fraud under 18 U.S.C. § 1347. The indictment included a forfeiture count under 18 U.S.C. §§ 981(a)(1)(C), 982(a) and 28 U.S.C. § 2461, claiming all gross proceeds it alleges traceable to the alleged offenses.

2. The substance of the Indictment centers on Mr. Biricik's ownership and operation of a laboratory – FastLab – that provided Covid tests to the general public, both antigen (i.e., point-of-care) and PCR tests. FastLab submitted claims to Medicare and other insurance companies for reimbursement. The government alleges he and his codefendant did so from September 2021 to July 2025 without meeting what were concededly fast-changing Covid-based Medicare

regulations. The government contends Mr. Biricik and his codefendant thus accrued more than $50 million in illicit proceeds.

3.     In Case 2:25-mc-50997, on July 29, 2025, the Eastern District of Michigan ordered, under seal, seizure of much of Mr. Biricik's real and personal property and financial assets. The government reports it has seized the following of Mr. Biricik's assets under forfeiture authority:

| Type | Description |
|---|---|
| Aircraft | 2025 Cirrus SR22T approx. $1.3 million |
| Vehicle | 2023 Lamborghini Urus approx. $175,000 |
| Financial Instrument | All Funds on Deposit in Morgan Stanley Account #XXX-XX1145 $4,497,385.71 |
| Vehicle | 2023 Bentley Bentayga approx. $150,000 |
| Vehicle | 2022 Ford Bronco Raptor approx. $60,000 |
| Financial Instrument | All Funds on Deposit in Morgan Stanley Account #XXX-XX1585 $10,000.00 |
| Financial Instrument | All Funds on Deposit in Morgan Stanley Account #XXX-XX1785 $79,965.72 |
| Vehicle | 2024 BMW M4 approx. $70,000 |
| Vehicle | 2023 Rivian R1T approx. $50,000 |
| Financial Instrument | All Funds on Deposit in Bank of America Account #XXXXXXXX0411 $3,834.12 |
| Financial Instrument | All Funds on Deposit in JP Morgan Chase Bank Account #XXXXX1005 $1,460.92 |
| Financial Instrument | All Funds on Deposit in JP Morgan Chase Bank Account #XXXXX3500 $2,129.66 |
| Financial Instrument | All Funds on Deposit in JP Morgan Chase Bank Account #XXXXX2609 $11,145.39 |
| Financial Instrument | All Funds on Deposit in Truist Bank Account #XXXXXXXXX1794 $17,951.82 |
| Financial Instrument | All Funds on Deposit in Truist Bank Account #XXXXXXXXX1808 $4,401.66 |
| Financial Instrument | All Funds on Deposit in Truist Bank Account #XXXXXXXXX1816 $1,009.82 |
| Financial Instrument | All Funds on Deposit in Truist Bank Account #XXXXXXXXX1798 $17,177.48 |
| Financial Instrument | All Funds on Deposit in Sun Trust Bank Account #XXXXXXXXX2295 $29,638.88 |
| Financial Instrument | All Funds on Deposit in Social Financial Bank Account #XXXXXXXX7728 $2,680.13 |

The total value of the seized assets is approximately $6,483,781.31. (The purchase of the automobiles was higher than the current fair market value.) The government has also recorded a *lis pendens* on his residence at 9623 Macchiato Avenue, Boca Raton, Florida. That residence has a market value of $4,725,000. The total asset seizure is thus $11,208,781.31. The 2024 BMW M4 is owned by Mr. Biricik's wife; she has title to the car. She has no other means of transportation. She is currently borrowing a car, but it will soon be unavailable to her.

4.     Mr. Biricik seeks modification of the seizure order to allow for reasonable family living expenses and for his defense costs. He asks that the 2024 BMW be released to his wife.

5. Mr. Biricik is 46 years old. He was born in Türkiye and is a U.S. citizen. He came to the United States in 1983. His family worked in design and operated a wholesale and retail clothing business and export company. From his youth, Mr. Biricik was exposed to imagery as an expression of culture. Design and imagery have always fascinated him. He attended college and studied Information Technology. He was a young and devoted father to his first child during these years. Mr. Biricik married Isabel Biricik in 2001. He and Mrs. Biricik have two children together. He is a nurturing and supportive father to all three of his children. He was deeply involved in their childhood lives, active in their schools, and in their community and social activities.

6. Initially, Mr. Biricik worked in the tech field. He started his own computer company at age 21. It had a national market, selling computers and computer parts across the U.S. It sold high-performing computer systems to various entities, including Hoffman Laroche and Pixar employees. Mr. Biricik was a trading partner for intel and received Intel confidential CPUs. He was the CEO and buyer for various New York and New Jersey luxury retail boutiques, such as a luxury retail store in SoHo. His clientele included high-end companies such as Aquafina, the St. Regis Hotel, the W Hotel, Fontainebleau hotels, the Waldorf Astoria, SLS hotels, and the Glashutte company.

7. In 2011, Mr. Biricik experienced a serious accident and suffered a severe concussion. He experienced months of memory loss and speech difficulties. This led him to relocate with his family to Florida to recuperate. Mr. Biricik renewed his interest in images and photography. He decided to pursue photography professionally and started a photography and video production business. He has had significant success in this field, winning many awards. He shot photography for Vogue, the Waldorf Astoria, the Ritz, the W Hotel and the Miami Dolphins.

8. Mr. Biricik has always been deeply committed to caring for his family members. His three children are completing college and starting their adult lives but still depend on him for support. Mr. Biricik's mother worked as a high school teacher, department chair, and curriculum writer in the world languages. She spoke four languages and worked for the United Nations. She was employed by the Jersey City Board of Education and is now retired. Mr. Biricik provides her assistance. Mr. Biricik's mother-in law was diagnosed with Parkinson's Disease last year and he also provides her with financial support. Mr. Biricik has one aunt who is hospitalized with a terminal illness. Mr. Biricik provides her with support as well.

9. Currently, all of Mr. Biricik's assets, including his bank accounts, have been seized. Mr. Biricik has absolutely no funds available to support his wife and family members, nor to provide for his legal defense.

10. FastLab has ceased operations, but it retains a brick-and-mortar presence. There are senior level management employees and computer technicians who have access to data regarding FastLab operations during the period of the ostensible offense conduct. Mr. Biricik requires this data in order to defend the Indictment. He must pay these employees their back wages in order to obtain the information, but he is unable to do so as all his assets are frozen. Six employees are owed approximately $11,083. He cannot obtain the business operational data he needs without making this back wage payment.

11. Mr. Biricik estimates the following family expenses: annually, he owes $64,000 in property taxes, $27,000 in home and flood insurance, and $15,000 in HOA fees. The tuition and housing costs for his three children cost Mr. Biricik about $106,000 yearly. This totals $212,000 a year, averaging $17,666 monthly. His regular monthly expenses include about $2,000 monthly in utilities and ground maintenance, $1500 monthly for phone and internet, monthly food

4

expenses of about $4000 (the family has special medical diet needs), $2500 monthly for health insurance, $2400 for auto, and about $1500 monthly in medical bills, or $13,900 a month. Thus, his average monthly expenses total approximately $31,566 a month. Mr. Biricik has significant legal fees exceeding $300,000.

12.     Health care fraud convictions carry with them mandatory forfeiture of property "derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. 18 U.S.C. § 982 (a)(7)." Forfeiture is governed by the provisions of 21 U.S.C. § 853. Id., § 982(b)(1). Section 853(e)(1)(A) authorizes a court to issue a restraining order to preserve the availability of criminally derived property after an indictment has issued but before conviction. 21 U.S.C. § 853. A court may issue a warrant authorizing seizure where "there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property." 21 U.S.C. § 853(f).  For the forfeiture statute to apply, the property needs to be tainted, meaning that it flows from the crime. *Honeycutt v. United States*, 581 US 443, 448 (2017). Forfeiture is limited to property that the defendant actually acquired from the offense. *Id. See United States v Sexton*, 894 F3d 787, 798 (6th Cir 2018).

13.     There is no automatic exemption from § 853's forfeiture or pretrial restraining order provisions for assets which a defendant wishes to use to retain an attorney. *United States v. Monsanto,* 491 U.S. 600, 614 (1989). However, a defendant "may be entitled to a hearing concerning the restraint of the subject properties to avoid an erroneous deprivation at a meaningful time." *United States v Jamieson*, 427 F3d 394, 405-406 (6th Cir 2005), citing *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998). Such a hearing may be necessary to satisfy due

process. *United States v Kahn*, 890 F3d 937, 940 (10th Cir 2018). The issue is whether the unseized assets are adequate to provide "for reasonable legal and living expenses." Id. at 649. If not, a hearing is justified upon a prima facie showing that seized assets are not traceable to the charged offense. *United States v Kahn*, 890 F3d 937, 941 (10th Cir 2018). Untainted funds must be made available, including for legal fees. See *Luis v United States*, 578 U.S. 5, 17 (2016). Courts have allowed payments from seized funds to cover a defendant's living expenses, including family member educational costs. See, e.g., *United States v Petters*, 2011 US Dist LEXIS 13357, at *6 (D Minn Feb. 10, 2011, No. 08-5348 ADM/JSM). Financial need is relevant to the issue whether a hearing is required. *United States v Prejean*, 2005 US Dist LEXIS 36511, at *7 (ED La Oct. 19, 2005). Availability of alternative assets to cover living expenses is also relevant to the court's analysis. Cf. *SEC v Dobbins*, 2004 US Dist LEXIS 6362, at *8 (ND Tex Apr. 14, 2004, No. 3: 04-CV-0605-H).

14. Mr. Biricik asserts the government's allegations in this case fall short of probable cause to support forfeiture. Probable cause is an "objective standard requiring an analysis of the totality of the circumstances." *United States v. Jackson*, 415 F.3d 88, 91, 367 U.S. App. D.C. 320 (D.C.Cir.2005) (citing authorities).

15. Here, the government claims over $50 million in loss from allegedly false Medicare and other insurance claims. The Indictment alleges fifty-eight (58) specific incidents of unlawful claims (Counts Two through Fifty-Nine), submitted under a variety of CPT codes, that range from $75 to $325 billed amount per claim The actual reimbursement for these 58 claims (the amount FastLab received) totals $4,497.88. The average amount paid for each claim is thus $77.55. The government does not allege any process by which it extrapolates from fifty—eight instances of alleged false claims, averaging $61.42, to the many hundreds of thousands of false

claims necessary to establish $50 million in loss. This calculation is facially specious. It does not support probable cause.

16.     There are other apparent deficiencies in the government's case. The government itself notes that Covid test insurance coverage rules changed dramatically over the course of the pandemic. There were periods of time a provider order was required; then period of times when it was not, or at least not required for an initial Covid test. There were periods of time test coverage required showing the test was necessary for management of a specific medical problem. Coverage then expanded to include over-the-counter antigen tests. After the Covid public health emergency ended in May 2023, over-the-counter tests were no longer covered. Only tests ordered by a doctor and conducted in an office or pharmacy were covered.

17.     The government alleges Mr. Biricik and his codefendant submitted claims for point-of-care tests when their company was not observing the test, and PCR tests when it was not collecting and testing samples. It also alleges Mr. Biricik and his codefendant submitted claims for repeat tests not conducted at all. But it provides no estimate at all about the number of claims that were for point-of-care instead of PCR tests (none were for over-the-counter tests), PCR tests without laboratory analysis or those which did receive analysis (FastLab operated an ongoing laboratory). It provides no estimate of claims that were follow-up tests. Instead, the government asks for an assumption that literally <u>all</u> claims submitted by FastLab were false.

18.     This assumption is facially unsupportable. Given the complexity of the claim procedure and Medicare regulations, it is particularly important for Mr. Biricik to have access to sufficient assets to pay the operational business costs necessary to obtain data critical to his defense.

19.     Nor has the government shown there is no other source for the assets it seized. Mr. Biricik had an established career in photography and videography over many years. He received

nearly a dozen honors and awards. The courts have held the term "proceeds" as it is used throughout § 982 establishes a "but for" factual test to determine what are considered forfeitable assets under the statute. Consistent with forfeiture's fundamental objectives of disgorgement and deterrence, if a defendant would not have derived certain funds or property but for committing the criminal offense, the funds or property are forfeited. *United States v. Porcelli*, 865 F.2d 1352, 1365 (2nd Cir. 1989); *United States v. Grant*, 2008 U.S. Dist. LEXIS 73479, 2008 WL 4376365, *2 n.1 (S.D.N.Y. Sept. 25, 2008) ("Proceeds are property that a person would not have had but for the criminal offense"). Here, there is ample evidence Mr. Biricik had the opportunity to have obtained a portion of the seized assets wholly independently of the alleged offense conduct.

20.  The government bears the burden to show probable cause of the commission of the offense and that the seized assets flow from the offense. *United States v. Bikundi*, 125 F. Supp. 3d 178, 190 (D.D.C. 2015), cited in *United States v Kazkaz*, 2023 US Dist LEXIS 111532, at *16-17 (ED Mich June 28, 2023, No. 23-20022). The allegations of the offense do not provide that probable cause.

21.  Accordingly, Mr. Biricik requests the seizure of his assets be lifted, or alternatively, a probable cause hearing on that seizure be ordered.

Dated:  September 30, 2025  
        New York, NY

Respectfully submitted,

*Jeff Chabrowe*

JEFFREY CHABROWE, ESQ.  
LAW OFFICES OF JEFFREY CHABROWE  
521 Fifth Avenue, 17th Floor  
New York, NY 10175  
(917) 529-3921  
jeff@chabrowe.com

cc:  Regina R. McCullough, Esq.

regina.mccullough@usdoj.gov
Kenton Craig Welkener, Jr.
kenton.welkener@usdoj.gov